IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUSTINA OCASIO, independent administrator of the Estate of Jesus Ocasio, deceased, <br><br> Plaintiff, <br><br> v. <br><br> VILLAGE OF NORTH AURORA, MARK SHILLAIR, TRAVIS FOLTZ, BRADLEY BROWN, KANE COUNTY SHERIFF'S OFFICE, BRIAN MCCARTY, and BRIAN POLKINGHORN, <br><br> Defendants. | No. 20 CV 4908 <br><br> Judge John J. Tharp, Jr. |

## ORDER

For the reasons set forth in the Statement below, Defendant Shillair's partial motion to dismiss [56] is denied and Defendants Foltz, Brown, Kane County Sheriff's Office, McCarty, and Polkinghorn's partial motions to dismiss [48][54][73] are granted. The plaintiff's conspiracy to deny access to court claim is dismissed, as are Defendants Foltz, Brown, Kane County Sheriff's Office, McCarty, and Polkinghorn. A telephone status hearing will be held on November 17, 2022, at 9:15 a.m. Dial-in instructions will be provided by separate docket entry.

## STATEMENT

This is an action under 42 U.S.C. § 1983 and Illinois common law stemming from a fatal police shooting and an alleged conspiracy to cover it up. The facts that follow are sourced from the plaintiff's second amended complaint and, for present purposes, are assumed true.

Late in the evening of August 21, 2019, Maria Rosa called the police from her home in the Village of North Aurora to report that her husband, Jesus Ocasio, had gone missing. Mr. Ocasio had left in a state of emotional distress (the couple had been experiencing some marital strife), and during a telephone conversation that followed, Ms. Rosa thought she had heard a gunshot. Mr. Ocasio owned a handgun. He also had a police record that included resisting arrest, battery, and violation of a protective order. Three North Aurora police officers responded to Ms. Rosa's call.

En route to Ms. Rosa and Mr. Ocasio's home, Defendant Officers Travis Foltz and Bradley Brown spotted Mr. Ocasio's vehicle, activated their sirens, and followed him for about a mile until he came to a stop in his driveway. Defendant Officer Mark Shillair—who had already

arrived—was speaking with Ms. Rosa outside the home (Ms. Rosa had requested that police meet her outside the home because there were children sleeping inside).

Parked in his driveway, Mr. Ocasio sat in his vehicle, window down, with a handgun pointed at his head. He spoke with the officers, who had surrounded his vehicle with weapons drawn. Mr. Ocasio then exited his vehicle and walked slowly towards his open garage while keeping his handgun pointed at his head. Officer Shillair commanded Mr. Ocasio to "drop the gun," which prompted Mr. Ocasio to turn and face Officer Shillair, who then fired a single shot at Mr. Ocasio. Officer Shillair's shot hit Mr. Ocasio in the head, fatally injuring him.

Within days, the Kane County Major Crimes Task Force—whose members comprise multiple law enforcement agencies throughout Kane County, Illinois—opened an investigation into the shooting. Defendant Officer Brian McCarty of the Kane County Sheriff's Office commanded the Task Force, and for this investigation, Defendant Officer Brian Polkinghorn of the Village of South Elgin Police Department assisted. On August 26 and 28, they interviewed Officers Foltz and Brown respectively.

At these interviews, the complaint alleges, Officers McCarty, Polkinghorn, Foltz, and Brown conspired to inaccurately recount the shooting in a way that would shield Officer Shillair from consequences. Officers Foltz and Brown each initially provided detailed accounts of the shooting that did not include any mentions of danger to themselves or others. But during their subsequent interviews, Officers McCarty and Polkinghorn used leading questions to prompt Officers Foltz and Brown to warp their accounts and repaint Mr. Ocasio as an imminent threat. Thus, in order to justify Officer Shillair's use of deadly force, the complaint says the officers agreed to a false narrative that depicted the lives of the responding police officers, and the lives of others at Mr. Ocasio's residence, to be in immediate danger.

Based at least in part on Officer McCarty and Polkinghorn's post-interview, investigative report of the incident, the Kane County State's Attorney found that Officer Shilllair was justified in shooting Mr. Ocasio and declined to pursue criminal charges.

Plaintiff Justina Ocasio, Mr. Ocasio's daughter, now seeks civil relief pursuant to the Civil Rights Act, 42 U.S.C. § 1983, the Illinois Survival Act, 755 Ill. Comp. Stat. 5/27-6, and the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/2. Her second amended complaint asserts a claim for use of excessive force against Officer Shillair (Counts I–V) and a claim for conspiracy to deny access to court against the four police officers involved in the alleged post-shooting cover-up (Count VI). She also seeks relief from the Village of North Aurora and the Kane County Sheriff's Office under theories of *respondeat superior* and indemnification (Counts VII–X). The defendants move separately to dismiss two theories of relief associated with the excessive force claim (Counts II and III), the cover-up conspiracy claim (Count VI), and Kane County Sheriff's Office's *respondeat superior* and indemnification liability (Counts IX and X). For the reasons below, Counts VI, IX, and X are dismissed.

A. **Counts II and III – Section 1983 and Illinois' Wrongful Death and Survival Acts**

Officer Shillair moves pursuant to both Federal Rule of Civil Procedure 12(b)(6) and 12(f) to dismiss or strike Counts II and III. A short outline of the operative complaint disposes of his argument.

Ms. Ocasio asserts in Count I that Officer Shillair's fatal shooting of her father violated her father's rights under the Fourth and Fourteenth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Section 1983 provides a method to vindicate constitutional rights, but those rights are Ms. Ocasio's father's, not hers. Hence, in Count III, Ms. Ocasio invokes Illinois' Survival Act to vindicate her father's rights as a representative of her father's estate. The Survival Act dictates that "actions to recover damages for an injury to the person," among other actions, survive within a decedent's estate after the decedent passes. 755 Ill. Comp. Stat. 5/27-6. As the Illinois Supreme Court has explained:

> The law . . . has always recognized that, if a person survives, he may bring a common law or statutory action against a party whose wrongful conduct has caused him such personal injury. At common law, however, the same action would abate upon the death of the injured person. To remedy this injustice, a survival statute was enacted (originally in 1872) to allow an action, such as . . . [an] action to recover damages for an injury to the person, to survive the death of the injured person. The Survival Act does not create a statutory cause of action. It merely allows a representative of the decedent to maintain those statutory or common law actions which had already accrued to the decedent before he died.

*Nat'l Bank of Bloomington v. Norfolk & W. Ry. Co.*, 73 Ill. 2d 160, 172, 383 N.E.2d 919, 923 (1978); *see also Spence v. Staras,* 507 F.2d 554, 558 (7th Cir. 1974).

While the Survival Act covers injuries incurred by a decedent while he or she was alive—such as any pain and suffering experienced prior to death—the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/2, allows surviving spouses and next of kin to recover for injuries *they* incurred because of the death. As the Illinois Supreme Court has also explained:

> A cause of action under the Wrongful Death Act is brought by the personal representative of the decedent. The purpose is to provide the surviving spouse and next of kin compensation for the pecuniary losses suffered by reason of the decedent's death. Unlike an action under the survival statute which allows a representative of the decedent to pursue those statutory or common law claims that accrued prior to the decedent's death, an action under the Wrongful Death Act does not accrue until death.

*Turcios v. DeBruler Co.*, 2015 IL 117962, ¶ 17, 32 N.E.3d 1117, 1123 (citations omitted). The damages recoverable under the Wrongful Death Act include "grief, sorrow, and mental suffering." 740 Ill. Comp. Stat. 180/2. Accordingly, in Count II, Ms. Ocasio invokes the

Wrongful Death Act to recover for the losses she and the rest of the Ocasio family suffered as a result of her father's death.

For completeness, Ms. Ocasio also invokes the Survival and Wrongful Death Acts in Counts IV and V, but these counts tie relief to an underlying state cause of action (the Illinois common law tort of willful and wanton conduct) rather than the federal cause of action underlying Counts II and III (section 1983). Officer Shillair does not challenge Counts I, IV, or V.

Moving under Rule 12(b)(6) to dismiss Counts II and III, Officer Shillair argues that Ms. Ocasio "cannot bring state law statutory relief pursuant to Section 1983." Shillair Mot. to Dismiss 4, ECF No. 56. "Section 1983," he says, "allows for recovery distinct from the Illinois statutes," and therefore, Ms. Ocasio "cannot plead separate state statutory actions which allow for distinct recovery under a federal statute which itself permits recovery." *Id.* at 5. On these same grounds, he moves under Rule 12(f) to strike Counts II and III as redundant of Count I.

Officer Shillair's reasoning is difficult to follow and equally difficult to cogently restate here. Suffice it to say, in civil rights actions, section 1988 provides for the use of state law to supplement the remedial powers of federal district courts whenever "the laws of the United States . . . are deficient in the provisions necessary to furnish suitable remedies . . . ." 42 U.S.C. § 1988. "Section 1983 is silent on the question whether a decedent's constitutional claims survive his death and on the issue of the appropriate measure of damages." *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1188 (7th Cir. 1985). Therefore, Illinois' Survival and Wrongful Death Acts, incorporated by section 1988, provide valid theories of relief to claims asserted under section 1983. *Id.* at 1189–90; *Spence v. Staras*, 507 F.2d 554, 557–58 (7th Cir. 1974); *see Pitzer v. City of E. Peoria*, 597 F. Supp. 2d 806, 810 (C.D. Ill. 2009) ("Section 1983 does not address what types of damages are available to the estate of a deceased claimant whose life was terminated by unconstitutional state action. . . . However, it is well established in our Circuit that a federal court may look to state law, pursuant to 42 U.S.C. § 1988, to answer this question of damages.").

In any case, Rule 12(b)(6) only authorizes courts to dismiss deficient claims, not legal theories. Fed. R. Civ. P. 12(b)(6); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of **parts** of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.") (emphasis in original). As long as a discernable legal theory plausibly provides a remedy for a claim, a motion to dismiss that claim must be denied, even if the complaint sets forth a host of alternative theories that fail. *See Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012) ("One claim supported by multiple theories does not somehow become multiple claims.").

Officer Shillair does not challenge Ms. Ocasio's underlying excessive force claim (Count I) or two other theories of relief based on the same set of facts (Counts IV and V). It is therefore beside the point that his rationale for dismissing Counts II and III is wrong. Because Officer Shillair takes issue with only some and not all of Ms. Ocasio's legal theories of relief, a Rule 12(b)(6) dismissal would be inappropriate regardless.

Because Counts II and III supplement Count I, Officer Shillair's Rule 12(f) redundancy argument does not work either. His partial motion to dismiss is therefore denied.

### B.    Count VI – Conspiracy to Deny Access to Court

In Count VI, Ms. Ocasio claims that Officers McCarty, Polkinghorn, Foltz, and Brown conspired to fabricate Officers Foltz and Brown's accounts of the shooting, effectively denying her an ability to seek relief from Officer Shillair. The officers move under Federal Rule of Civil Procedure 12(b)(1) to dismiss this so-called denial of access to court claim on grounds that it is not ripe.

Claims for denial of access to court can either be forward-looking or backward-looking. A forward-looking claim is a claim that "systemic official action [is] frustrat[ing] a plaintiff or plaintiff class in preparing and filing suits . . . ." *Christopher v. Harbury*, 536 U.S. 403, 413 (2002). The relief sought in these types of claims is the removal of the condition frustrating future suits, such as the establishment of a prisoner law library or the waiver of filing fees for indigent plaintiffs. *See id*. A backward-looking claim, on the other hand, is a claim that a specific case "cannot now be tried (or tried with all material evidence)" due to official acts. *Id.* at 413–14. The ultimate object of these sorts of access claims is the recovery of "a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.* at 415.

Ms. Ocasio's claim against Officers McCarty, Polkinghorn, Foltz, and Brown is a backward-looking claim because she claims that she can no longer prevail on her excessive force claim against Officer Shillair because Officers Foltz and Brown—the only two eyewitnesses—have conspired with Officers McCarty and Polkinghorn to conceal the facts of the shooting. A conspiracy in and of itself is not an independent basis for liability in section 1983 actions. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1254 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005) (requiring plaintiffs to show that the alleged "conspiracy deprived them of rights protected by federal law"). However, an officer's intentional concealment of "the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015). But Ms. Ocasio is still litigating her excessive force claim and it is presently unclear whether the true facts about her father's shooting will be concealed. Accordingly, her denial of access to court claim is premature. On this point, the Seventh Circuit's decision in *Harer v. Casey*, 962 F.3d 299 (7th Cir. 2020), is dispositive.

In *Harer*, plaintiffs brought suit under section 1983 claiming use of excessive force against their daughter's boyfriend, a police officer who they say shot and killed their daughter following a fight inside her apartment. 962 F.3d at 302–05. The plaintiffs also named the investigating detective and various other officers in a conspiracy to deny access to court claim. *Id*. They alleged the detective and other officers declined to question or investigate the boyfriend despite his history of violence against women, altered incriminating blood spatter and gunshot residue evidence, and concealed the existence of sympathetic witnesses in order to sustain their designation of the incident as a suicide. *Id*.

5

On interlocutory appeal from a failed challenge to the backward-looking denial of access claim, the *Harer* Court explained that "the operative question is not whether a plaintiff's case would have been better had the police conducted a worthy investigation, but whether their failure to do so limited his ability to obtain legal redress to such degree that it constituted a denial of judicial access." *Id.* at 306 (quoting *Rossi*, 790 F.3d at 735). To determine this, a plaintiff is required to identify: "(1) a nonfrivolous, underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement." *Id.* at 308 (citing *Christopher*, 536 U.S. at 415). But given that the *Harer* plaintiffs were still prosecuting their underlying excessive force claim, it was "too early to say" that the remedy they sought was not otherwise available. *Id.* at 309. "Unless and until the [plaintiffs'] claim against [the officers] suffers some concrete setback traceable to the defendants' alleged cover-up, their allegation that the defendants impaired their effort to bring that claim is no more than speculation about an event that may or may not come to pass." *Id.* (quoting *Waller v. Hanlon*, 922 F.3d 590, 602 (5th Cir. 2019)). "This uncertainty is why an access-to-court claim ordinarily may not proceed at the same time and in the same case as a timely-filed underlying claim . . . ." *Id*. "[R]elief must be 'completely foreclosed.'" *Id.* (quoting *Broudy v. Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006)).

The *Harer* Court continued:

> Not only are the [plaintiffs'] claims pending in federal court, the [plaintiffs] have the full discovery process available to them. They can submit requests for documents, issue interrogatories, take depositions, and the like as part of trying to learn, confirm, or uncover facts to support their theories of wrongful death and related cover-up. All discovery will occur under the district court's supervision, and the court can address any fraud it finds. Discovery provides the [plaintiffs] with access to information, and as a result, access to court.

*Id.* at 310. "With the ultimate resolution of their wrongful death case in doubt," the Seventh Circuit concluded, "the [plaintiffs'] access-to-court claim is not ripe for judicial review." *Id.* at 310–11.

The same is true here. Even if, as we must assume in the context of this motion, the officers conspired to lie about the shooting in their Task Force interviews, it is not yet known whether they will continue to do so under oath at Officer Shillair's future trial, much less whether their allegedly doctored testimony will be credible or substantially discredited through cross-examination or other testimony or evidence. It is possible that the officers' presumptive, future perjury will completely foreclose relief on Ms. Ocasio's excessive force claim, but at present that outcome is pure speculation.

Ms. Ocasio raises a few points to argue her sought-after relief is already foreclosed by Officers Foltz and Brown's interview statements. She contends it is "extremely unlikely" that the officers will contradict their interview statements at trial because those statements could be used for impeachment, and even if they do tell the truth at trial, such impeachment would be

6

"materially harmful" to her case. Resp. 6, ECF No. 58. But just because the officers could be impeached does not force them into perpetuating their lie on the stand, and assuming they do tell the truth, a jury could still easily decide their in-court testimony incriminating their fellow colleague is credible despite their prior interview statements absolving him.

Ms. Ocasio also asserts that the statute of limitations will likely run on her denial of access claim before a trial on her excessive force claim concludes. "Under § 1983, plaintiffs must file suit within two years if they complain of conduct arising in Illinois." *Mehta v. Beaconridge Improvement Ass'n*, 432 F. App'x 614, 617 (7th Cir. 2011). But "[w]hen the tort involves continuous or repeated injurious behavior, . . . the limitations period is held in abeyance and the plaintiff's cause of action does not accrue until the date the final injury occurs or the tortuous acts cease." *Logan v. City of Chicago*, 4 F.4th 529, 540 (7th Cir. 2021) (internal quotations omitted). Here, the final injury Ms. Ocasio is concerned with—the foreclosure of her excessive force claim as a result of the officers' conspiracy—has yet to occur; therefore, the statute of limitations on her conspiracy claim has not yet begun to run.

Finally, Ms. Ocasio cites *Rainey v. City of Chicago*, No. 10 C 07506, 2013 WL 941968 (N.D. Ill. Mar. 11, 2013), to support her contention that her denial of access to court claim is ripe. *Rainey*, too, involved claims of excessive force and a police conspiracy to cover-up it up, both litigated in the same case. On summary judgment, the *Rainey* Court allowed the plaintiff's conspiracy to deny access to court claim to proceed alongside his excessive force claim. *Id.* at *12. It based this decision on the fact that the alleged conspiratorial acts—falsification of post-arrest police reports—prevented the plaintiff from identifying all the police officers involved in his beating (the plaintiff had covered his face during the alleged attack by police). *Id*. Hence, the plaintiff could "not know all the facts necessary to bring his claim . . . without deposing each of the dozens of officers present at the scene." *Id*. This "hindrance," the *Rainey* Court explained, was enough to sustain the denial of access claim despite the contemporaneous viability of the underlying excessive force claim. *Id*.

*Rainey* was decided seven years before *Harer* and does not survive it. As noted earlier, discovery, including "tak[ing] depositions, . . . provides [a plaintiff] with access to information, and as a result, access to court." *Harer*, 962 F.3d at 310. Whatever "hinderance," then, that the *Rainey* plaintiff may have incurred by the need to depose the police officers present at his arrest is not the kind of injury recognized by judicial-access law given that his underlying claim was "timely, facially plausible, and still pending." *See id*. Simply put,

> showing delay alone is not enough; the plaintiffs must . . . show the delay caused some further harm to their cause of action. Expense associated with delay, in and of itself, also does not tangibly harm a cause of action. Instead, the kind of injury cognized by judicial-access law is, as we stated above, the complete foreclosure of relief.

*Id.* at 311 (internal quotations and citations omitted).

Ms. Ocasio's conspiracy to deny access to court claim (Count IV) is dismissed without prejudice. No other theory of liability has been offered against Officers Foltz, Brown, McCarty, and Polkinghorn and consequently they are dismissed as defendants.

### C. Counts IX and X – Kane County Sheriff's Office's Liability

In Counts IX and X, Ms. Ocasio seeks relief from the Kane County Sheriff's Office for Officer McCarty's liability under theories of *respondeat superior* and indemnification. In her response to the Sheriff's Office's motion to dismiss, Ms. Ocasio acknowledges that these theories are inapplicable. Resp. 9–10, ECF No. 60. The Kane County Sheriff's Office is therefore dismissed. Ms. Ocasio requests leave to amend her complaint to name Kane County instead, but because no claim remains pending against Officer McCarty, that request is, at present, futile. Should Ms. Ocasio file an amended complaint asserting a plausible claim against Officer McCarty, however, she has leave to add Kane County as a defendant.

Date: October 28, 2022

John J. Tharp, Jr.
United States District Judge